IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
COLUMBIA DIVISION

| | | |
|---|---|---|
| James D. Odom, | ) | C/A No.: 3:14-456-MGL-SVH |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | |
| | ) | REPORT AND RECOMMENDATION |
| CVS Caremark Corporation; CVS Rx | ) | |
| Services, Inc.; and South Carolina CVS | ) | |
| Pharmacy, LLC, | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

In this employment discrimination case, James Odom ("Plaintiff") sues his former
employer CVS Rx Services, Inc., and its related entities CVS Caremark Corporation and
South Carolina CVS Pharmacy, LLC ("Defendants" or "CVS"),[1] for sex discrimination
pursuant to Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e, *et.
seq.* ("Title VII"), age discrimination in violation of the Age Discrimination in
Employment Act of 1967, 29 U.S.C. § 621, *et seq.* ("ADEA"), and defamation.[2] [ECF
No. 43]. This matter comes before the court on Defendants' motion for summary
judgment filed on November 12, 2015 [ECF No. 71]. The motion having been fully
briefed [ECF Nos. 71, 83, 89], it is ripe for disposition.

---

[1] The store in which Plaintiff worked is owned and operated by South Carolina CVS
Pharmacy, LLC, but Plaintiff was employed by CVS Rx Services, Inc. [ECF Nos. 43 at ¶
11, 62 at ¶ 11]. CVS Caremark Corporation ("CVS Caremark") is the parent corporation
of CVS Rx Services, Inc. [ECF Nos. 43 at ¶ 2, 62 at ¶ 2]. Notwithstanding their separate
legal identities, the undersigned may refer to Defendants interchangeably as "CVS" for
ease of reference.
[2] The court previously dismissed Plaintiff's claim for wrongful termination in violation of
public policy. [ECF No. 61].

All pretrial proceedings in this case were referred to the undersigned pursuant to the provisions of 28 U.S.C. § 636(b)(1)(B) and Local Civ. Rule 73.02(B)(2)(g) (D.S.C.). Because the motion is dispositive, this report and recommendation is entered for the district judge's consideration. For the reasons that follow, the undersigned recommends Defendants' motion for summary judgment be granted.

I.    Factual Background

Plaintiff began working for CVS in 1996, after his former employer was acquired by the corporation. Pl. Dep. 11:15–18.[3] Since July 2007, Plaintiff has worked at CVS store 830, located at 900 Assembly Street in Columbia, South Carolina (the "Pharmacy"), as the Pharmacist-in-Charge ("PIC"). Pl. Dep. 11:19–23. His job duties involved managing the Pharmacy and supervising all its employees. Pl. Dep. 12:2–13:2; ECF No. 71-4 at 5–6. Plaintiff was "[r]esponsible for all aspects of pharmacy operations," which included "pharmacy practice, quality assurance[,] customer service, personnel, inventory management and loss prevention." [ECF No. 71-4 at 5]. The following individuals were also employed at the Pharmacy during 2012 and 2013: staff pharmacists Kelly Smith ("Ms. Smith") and Jamie Pelfrey ("Ms. Pelfrey"), lead pharmacy technician Brenda Nordeoff ("Ms. Nordeoff"), and pharmacy technician Devin Pearson ("Ms. Pearson"). Pl. Dep. 13:3–24.

As PIC, Plaintiff was responsible for the Pharmacy employees' compliance with federal and state laws, rules, and regulations. Pl. Dep. 25:8–13; ECF No. 71-4 at 5.

---

[3] Plaintiff's deposition may be found at ECF Nos. 71-2 and 83-1.

Plaintiff was required to review CVS's Code of Conduct ("Code of Conduct")[4] during biannual assessments. Pl. Dep. 43:3–44:9. He was aware that CVS could discipline or terminate any employee for illegal or unethical conduct, dishonesty, falsification of company records or reports, and violations of patient confidentiality. Pl. Dep. 35:8–15, 37:4–42:1. Plaintiff was required to maintain patient confidentiality according to the Health Information Portability and Accountability Act of 1996, Pub. L. No. 104–191, 110 Stat. 1936 (1996) (as amended) ("HIPAA"). Pl. Dep. 25:14–16; ECF No. 71-4 at 5. He was required to confidentially maintain protected health information, including names, addresses, dates of birth ("DOB"), phone numbers, and social security numbers that were combined with medical information, such as medical diagnoses, prescription histories, and physical notations. Code of Conduct at 8; Pl. Dep. 39:24–40:7, 44:18–45:16. Plaintiff was also required to protect personally-identifiable information, defined as "any piece of information which can potentially be used to uniquely identify, contact, or locate a single person," including demographic information and other unique identifiers such as credit card data, email addresses, driver's license numbers, fingerprints, and handwriting. Code of Conduct at 8; Pl. Dep. 45:17–46:24. Plaintiff was prohibited from divulging patient information to other CVS employees or to those outside the CVS organization, except to the extent that it was necessary for proper completion of prescriptions and care of patients. Pl. Dep. 39:24–41:1, 48:2–11, 55:8–24, 56:13–57:6; Code of Conduct at 8. Plaintiff knew that a violation of the patient confidentiality policy could result in

---

[4] Code of Conduct may be found at ECF Nos. 71-4 at 45–79 and 83-3.

disciplinary action up to and including termination, even for a first violation. Pl. Dep. 42:12–25.

The Pharmacy was also required by South Carolina law to keep a log of the driver's license ("DL") numbers for individuals who picked up prescriptions for controlled substances. Pl. Dep. 25:18–27:9. The Pharmacy used the following standard procedure in filling prescriptions: When a prescription was dropped off or called in, a pharmacy technician would enter the prescription data into the computer and print a label for the prescription. Pl. Dep. 30:9–21. An additional label would print if the prescription was for a controlled substance. Pl. Dep. 28:16–24. The technician would then fill the prescription from a stock bottle and pass it to the pharmacist, who would verify the accuracy of the prescription, sign off on it, and bag it. Pl. Dep. 30:22–31:18. The additional label for the controlled substance would be attached to a label that was placed on the bag. Pl. Dep. 31:19–25. When an individual picked up a prescription for a controlled substance, the technician would remove the additional label from the prescription label, record the DL number of the individual picking up the prescription, and place the additional label in a spiral notebook that the Pharmacy maintained as a controlled substances log ("CS log"). Pl. Dep. 26:7–28:24. Active CS logs were located at the pharmacy counter registers and at the drive-thru register. Pl. Dep. 65:10–66:4; Nordeoff Dep. 73:11–23. When an active CS log became filled, it was initially stored in a box downstairs at the Pharmacy, and then ultimately moved to an upstairs storage area. Pl. Dep. 66:9–13, 67:7–17.

In May 2013, Bobby Jack Spivey, Jr. ("Spivey"), an investigator with the South Carolina Department of Health and Environmental Control ("SCDHEC"), visited the Pharmacy to investigate a fraudulent prescription filled in the name of B.C. by Ms. Smith on January 28, 2013. Spivey Dep. 13:15–24.[5] Ms. Smith was no longer employed by the Pharmacy when Mr. Spivey visited the store in May 2013. Nordeoff Dep. 34:23–25; Hammond Dep. 91:11–15.[6] Although Ms. Pelfrey had not been working on January 28, 2013, at Spivey's request, she signed a form affidavit that stated a positive identification had been obtained when the patient picked up the prescription. Spivey Dep. 20:12–21:18.[7] Spivey initially reviewed the CS logs with Ms. Nordeoff, but was unable to obtain the entry for B.C. Nordeoff Dep. 30:23–33:21; Spivey Dep. 26:22–31:12. He instructed Ms. Nordeoff to continue examining the CS logs and indicated he would return in a couple of days. Nordeoff Dep. 33:23–25.[8]

Ms. Nordeoff informed Plaintiff of Spivey's visit, and the pharmacy staff continued to search for the CS log entry for B.C. Nordeoff Dep. 34:16–35:12. When Spivey returned, Plaintiff or Ms. Nordeoff looked up B.C. in the computer system and provided Spivey with the phoned-in prescription, the prescription number, and a copy of an illegible electronic signature from the person who signed for the prescription. Pl. Dep.

---

[5] Spivey's deposition may be found at ECF Nos. 71-6 and 83-7.
[6] Mr. Hammond's deposition may be found at ECF Nos. 71-13 and 83-9.
[7] Ms. Pelfrey did not indicate that she was the pharmacist on duty on January 28, 2013. Spivey Dep. 22:18–23:2. Mr. Spivey represented that the pharmacist's signature on the affidavit signified that it was standard procedure for the Pharmacy to obtain an ID. Spivey Dep. 23:3–6.
[8] Brenda Nordeoff's deposition may be found at ECF No. 83-6.

62:15–64:17, 68:18–69:21. Spivey again requested the CS log entry, but Plaintiff and Ms. Nordeoff were unable to find it. Pl. Dep. 62:24–63:1, 63:14–18, 66:23–67:3, 67:22–25.

Spivey stressed to Plaintiff that it was imperative that he find the CS log entry for B.C. Pl. Dep. 63:17–20; Spivey Dep. 31:16–32:2. Plaintiff was aware that SCDHEC could assess a $2,500 fine if pharmacy did not produce the CS log entry. Pl. Dep. 157:14–24.[9]

At some point, Plaintiff gave B.C.'s name, DOB, and address, to store manager Travis Blackwell ("Mr. Blackwell"), and without explaining the reason for the request, asked Mr. Blackwell if he could obtain B.C.'s DL number. Pl. Dep. 81:8–82:15. Mr. Blackwell was unable to obtain B.C.'s DL number. Pl. Dep. 82:16–18. Plaintiff subsequently gave the same information to store manager Michele Garrison ("Ms. Garrison") and requested the same. Pl. Dep. 89:13–90:16. Plaintiff did not divulge his reason for obtaining B.C.'s DL number to Ms. Garrison. Pl. Dep. 90:23–25. Plaintiff thought that Ms. Garrison knew law enforcement officers, from whom she would request that they search for B.C.'s DL number. Pl. Dep. 90:17–25; Garrison Dep. 12:2–3. On Wednesday, May 15, 2013, Ms. Garrison contacted a police officer, who sent her a text message with B.C.'s DL number, which she provided to Plaintiff. Pl. Dep. 91:1–24; Garrison Dep. 12:17–20, 14:9–13.[10]

Following the weekend of May 18–19, 2013, Plaintiff left a message for Spivey indicating he had found the prescription entry in the CS log. Pl. Dep. 74:21–75:1, 96:25–

---

[9] Spivey testified that SCDHEC could only take action against the PIC, as opposed to the Pharmacy. Spivey Dep. 73:13–74:18, 95:14–97:19.
[10] Ms. Garrison's deposition may be found at ECF No. 71-10.

97:4. On Monday, Plaintiff instructed Ms. Nordeoff where to find the CS log entry in case Spivey returned after his shift. Pl. Dep. 75:1–5, 100:24–101:16. Spivey returned to the Pharmacy, removed the page with the entry for B.C. from the CS log notebook, and took it with him. Spivey Dep. 35:1–13.

Spivey contacted B.C., who denied having obtained the fraudulent prescription. Spivey Dep. 37:12–15. B.C. agreed to submit to a polygraph examination, but the test was not completed because B.C. had a seizure and could not complete it. Spivey Dep. 37:21–38:5. Spivey subsequently arrested a man by the name of James Sullivan ("Mr. Sullivan") in connection with the fraudulent prescription, who confessed that he had picked up the fraudulent prescription and stated he was not asked for his DL. Spivey Dep. 38:8–19.

In July 2013, Spivey contacted regional loss prevention manager Shannon Hammond ("Mr. Hammond") and informed him that he was investigating a fraudulent prescription filled at the Pharmacy. ECF No. 71-4 at 82; Spivey Dep. 45:18–46:11; Hammond Dep. 11:20–13:7. Spivey followed up with Mr. Hammond around the second week of August and informed him that he believed the CS log entry obtained from the store had been falsified. Hammond Dep. 13:8–14:3. On August 26, 2013, Mr. Hammond met with Spivey at the Pharmacy, viewed the CS log entry, and concluded the prescription label and DL number had been added after the fact. ECF No. 71-4 at 82; Hammond Dep. 15:1–8. Spivey requested that Mr. Hammond investigate the matter. ECF No. 71-4 at 82; Hammond Dep. 15:12–14, 17:16–18:10. Mr. Hammond spoke with Ms. Pearson, whose employee number was used to ring up the prescription purchase. ECF

No. 71-4 at 82; Hammond Dep. 25:11–26:16. Ms. Pearson identified the handwriting used to capture the DL numbers above and below that for B.C. as hers, but denied that the DL number for B.C. was written in her handwriting. ECF No. 71-4 at 82; Hammond Dep. 26:2–6. Mr. Hammond subsequently interviewed Ms. Nordeoff. ECF No. 71-4 at 82; Spivey Dep. 51:16–52:6; Hammond Dep. 27:10–28:22. Ms. Nordeoff related to Mr. Hammond that Plaintiff told her he had reprinted the label and placed in the log in a manner that made it appear like it could have been missed upon earlier inspection, and she prepared a statement to this effect.[11] Nordeoff Dep. 37:13–18, 38:21–39:3, 44:22–47:24; Hammond Dep. 28:4–22, 30:2–25; ECF No. 71–15 at 2–3. Mr. Hammond also spoke with Plaintiff about the B.C. entry in the CS Log. Pl. Dep. 130:1–132:25; Hammond Dep. 43:2–24; [ECF No. 71-4 at 83]. Plaintiff stated he found the log entry, but denied having falsified the log.  Pl. Dep. 133:2–16; Hammond Dep. 43:9–14, 44:5–6.

Mr. Hammond contacted Spivey, informed him of the information he received from Ms. Pearson and Ms. Nordeoff, and planned to meet him at the Pharmacy on August 28, 2013. Hammond Dep. 31:4–10. On August 28, 2013, Mr. Hammond initially met with Spivey and showed him Ms. Nordeoff's statement. Hammond Dep. 31:20–25. Spivey questioned Ms. Nordeoff in Mr. Hammond's presence and verified the information in her statement. Spivey Dep. 51:21–52:10; Hammond Dep. 32:10–12. Mr. Hammond and Spivey subsequently interviewed Ms. Garrison, who indicated Plaintiff had provided her with B.C.'s name, address, and DOB and requested that she use her

---

[11] Plaintiff denies Ms. Nordeoff's allegation and alleges Ms. Nordeoff fabricated the story because he had given her a negative performance evaluation on August 9, 2013. Pl. Dep. 101:17–25, 163:19–164:1; Nordeoff Dep. 55:16–61:5; Knight Dep. 13:23–25; *see also* ECF No. 83-11.

police contacts to obtain B.C.'s DL number. [ECF No. 71-4 at 83]; Hammond Dep. 36:17–38:10. Ms. Garrison showed Mr. Hammond and Spivey the text exchange in which she had obtained B.C.'s DL number from a friend who was a police officer. ECF No. 71-4 at 83; Spivey Dep. 53:1–16.

Mr. Hammond and Spivey interviewed Plaintiff, and Spivey informed Plaintiff he would be recording his conversation with Plaintiff. Pl. Dep. 138:6–14; Hammond Dep. 42:12–17. Plaintiff admitted that he gave B.C.'s personal information to Ms. Garrison to obtain B.C.'s DL number, but stated he only used the information as another means to search the log. Pl. Dep. 163:6–13; Hammond Dep. 45:8–19. Spivey advised Plaintiff that he had been doing his job for a long time and knew that the entry for B.C. was placed in the log after the fact. Pl. Dep. 135:11–13; Spivey Dep. 52:7–18. Upon Spivey's request, Plaintiff agreed to submit to a polygraph examination, which they scheduled for September 10, 2013. Pl. Dep. 141:14–142:6.[12]

On August 30, 2013, Mr. Hammond sent an email to regional manager Darren Twedell ("Mr. Twedell") and regional human resources manager Gerald Cunningham ("Mr. Cunningham") and copied district manager Ann Pruter ("Ms. Pruter") and Columbia market pharmacy supervisor Thomas Phillips ("Mr. Phillips"). [ECF No. 71-4 at 82–83]. Mr. Hammond summarized the findings of his investigation and posited that Plaintiff had violated CVS's HIPAA policy and HIPAA laws by giving out B.C.'s information to obtain B.C.'s DL number and that Plaintiff was likely to be charged with a misdemeanor for having provided false information. *Id.* Ms. Pruter responded to Mr.

---

[12] Spivey testified that Plaintiff did not appear for the scheduled polygraph examination. Spivey Dep. 100:6–11.

Cunningham and Mr. Twedell that Plaintiff was off until Tuesday morning and stated that

Mr. Phillips and she would terminate Plaintiff before his shift on Tuesday morning, if Mr.

Cunningham and Mr. Twedell authorized it. *Id.* at 81–82. On September 2, 2013, Ms.

Pruter emailed Mr. Cunningham and copied Mr. Phillips. *Id.* She asked Mr. Cunningham

whether CVS should terminate Plaintiff or suspend him without pay until the

investigation was complete. *Id.* On September 3, 2013, Mr. Cunningham replied that

CVS had "a clear cut issue with the HIPPA [sic] violation" and it was "permissible to

take action for that issue along [sic]."[13] *Id.*

Around 7:00 a.m. on Wednesday, September 4, 2013, Plaintiff was met in the

Pharmacy's parking lot by Ms. Pruter and Mr. Phillips, who informed him he was being

terminated because he committed a HIPAA violation. Pl. Dep. 144:9–23, 145:14–20.

Plaintiff informed Mr. Phillips that he needed to retrieve some personal items from the

Pharmacy, and Mr. Phillips accompanied him inside the building. Pl. Dep. 146:16–19.

Plaintiff could not recall who was in the building at the time, but indicated he saw only

one store employee and no Pharmacy employees. Pl. Dep. 148:3–149:4. He did not hear

Mr. Phillips or Ms. Pruter say anything about his termination to any other employee. Pl.

Dep. 150:10–17. Ms. Nordeoff stated she was informed of Plaintiff's termination by an

---

[13] Ms. Pruter and Mr. Phillips both indicated Plaintiff was terminated because of the HIPAA violation—not because of the allegation that he had falsified the C.S. log entry. Pruter Dep. 33:12–23, 36:14–15, 39:4–40:14, 42:16–43:8; Phillips Dep. 44:13–21, 50:1–5. According to Ms. Pruter, the decision to terminate Plaintiff was ultimately made by Mr. Cunningham, with input from her and Mr. Twedell. Pruter Dep. 36:24–37:23. Mr. Phillips was informed of the decision to terminate Plaintiff, but was not consulted by Mr. Cunningham, Ms. Pruter, or Mr. Twedell as part of the decision-making process. Pruter Dep. 37:24–38:4; Phillips Dep. 26:23–27:20.

employee in the front of the store who had observed the encounter between Plaintiff and Mr. Phillips in the parking lot. Nordeoff Dep. 62:13–19.

Ashley Knight ("Ms. Knight"), a Pharmacy intern who had been transferred to another store, contacted the Pharmacy and spoke with Ms. Nordeoff. Knight Dep. 7:25–8:3, 9:13–18.[14] Ms. Nordeoff informed Ms. Knight that Plaintiff had been terminated for writing down identification information in the CS log for a patient who had not presented identification. Knight Dep. 11:12–21. Ms. Knight stated Ms. Nordeoff indicated to her that the next pharmacist would be scared because she had effectuated the firing of the last two pharmacists.[15] Knight Dep. 13:1–9. Ms. Knight subsequently contacted Plaintiff, who informed her that he had been terminated and explained to her the course of events that had transpired. Knight Dep. 18:2–13.

Mr. Hammond also informed Spivey of Plaintiff's termination, and Spivey indicated that Plaintiff had received significant punishment and that he would not be charging him with a misdemeanor. Spivey Dep. 82:19–84:1; Hammond Dep. 72:13–25.

Plaintiff stated he believed he was defamed by Defendants because he would be required to inform prospective employers that he had been terminated from his last job and explain the reasons for his termination. Pl. Dep. 159:3–12; Hammond Dep. 72:11–25. He denied any knowledge that Defendants had told prospective employers about his termination. Pl. Dep. 159:13–16. Plaintiff stated he had not looked for employment since he was terminated from the Pharmacy. Pl. Dep. 159:17–161:1.

---

[14] Ms. Knight's deposition may be found at ECF No. 83-12.

[15] According to Ms. Knight, Ms. Nordeoff specified that she had played a part in the firings of both Ms. Smith and Plaintiff. Knight Dep. 13:11–14.

In this action, Plaintiff argues he was discriminated against based on his age and gender because he was replaced by a younger female pharmacist. Pl. Dep. 169:10–16. When Plaintiff was terminated, Mr. Phillips was 58 years old; Mr. Cunningham was 52 years old; Mr. Twedell was 50 years old; and Ms. Pruter was 50 years old. *See* Pl. Dep. 164:2–12, 165:3–10; Phillips Decl. at ¶ 2; Cunningham Decl. at ¶¶ 2–3; Pruter Decl. at ¶ 2.[16] Plaintiff estimated that Mr. Hammond was in his late thirties, Ms. Pelfrey was in her early to mid-twenties, Ms. Garrison was in her early forties, Ms. Smith was 25 or 26 years old, and Mr. Blackwell was 33 years old. Pl. Dep. 227:10–21, 229:1–230:15. Ms. Nordeoff was 31 years old. Nordeoff Dep. 90:21–23.

Mr. Blackwell and Ms. Garrison were disciplined for their actions with regard to the HIPAA violation. Pl. Dep. 166:2–3; Hammond Dep. 66:23–67:8; Pruter Dep. 25:14–33:1; Pruter Decl. at ¶ 4; [ECF No. 71-18 at 9, 11]. Plaintiff admitted that Mr. Blackwell and Ms. Garrison disclosed B.C.'s information at his request. Pl. Dep. 166:15–20. He stated that it was not improper for Ms. Smith to have dispensed the prescription for B.C. Pl. Dep. 167:8–168:5. He also stated it was not improper for Ms. Nordeoff to have accepted the phoned-in prescription for B.C. Pl. Dep. 168:11–21.

II.    Discussion

A.    Standard on Summary Judgment

The court shall grant summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The movant bears the initial burden of demonstrating that

---

[16] Mr. Phillips' and Ms. Pruter's declarations may be found at ECF No. 71-12 and 71-18, respectively. Ms. Pruter's Declaration may be found at ECF No. 71-18 at 2–3.

summary judgment is appropriate; if the movant carries its burden, then the burden shifts to the non-movant to set forth specific facts showing that there is a genuine issue for trial. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986). If a movant asserts that a fact cannot be disputed, it must support that assertion either by "citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials;" or "showing . . . that an adverse party cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56(c)(1).

In considering a motion for summary judgment, the evidence of the non-moving party is to be believed and all justifiable inferences must be drawn in favor of the non-moving party. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). However, "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment. Factual disputes that are irrelevant or unnecessary will not be counted." *Id.* at 248.

B.    Analysis

1.    Discrimination Claims

A plaintiff may prove sex discrimination (1) through direct and indirect evidence or (2) through the burden-shifting framework of *McDonnell Douglas Corp. v. Green,* 411 U.S. 792 (1973). *Price v. Thompson,* 380 F.3d 209, 212 (4th Cir. 2004). The Fourth Circuit has referred to these two avenues of proof as the mixed motive framework and the pretext framework, respectively. *Hill v. Lockheed Martin Logistics Mgmt., Inc.,* 354 F.3d

277, 284–85 (4th Cir. 2004) (en banc). It is left to the plaintiff's discretion whether to proceed using the mixed motive or pretext framework. *Diamond v. Colonial Life & Accident Ins. Co.,* 416 F.3d 310, 318 n. 4 (4th Cir. 2005) ("In the event that a plaintiff has direct evidence of discrimination or simply prefers to proceed without the benefit of the burden-shifting framework, []he is under no obligation to make out a prima facie case.").

To use a mixed-motive analysis, a plaintiff may establish a claim of discrimination by demonstrating through direct or circumstantial evidence that sex discrimination motivated the employer's adverse employment decision. *Hill v. Lockheed Martin Logistics Mgt., Inc.*, 354 F.3d at 285. Although courts formerly required direct evidence for a mixed motive case, the Supreme Court held that no such "heightened showing through direct evidence" is required. *Desert Palace Inc. v. Costa,* 539 U.S. 90, 98–99 (2003). Relying upon the plain text of the statute, the Court held that a Title VII plaintiff "need only demonstrat[e] that an employer used a forbidden consideration with respect to any employment practice." *Id.* at 98. "[A] plaintiff need only present sufficient evidence," direct or circumstantial, "for a reasonable jury to conclude, by a preponderance of the evidence, that race, color, religion, sex, or national origin was a motivating factor for any employment practice." *Id.* at 101–02 (internal quotation marks omitted).

Because the ADEA requires that Plaintiff prove that age was the "but-for" cause of his termination, ADEA claims sought to be proven using circumstantial evidence are analyzed under the burden-shifting pretext framework utilized in Title VII claims. *Bodkin v. Town of Strasburg*, 386 F. App'x 411, 413–14 (4th Cir. 2010); *Gurganus v. Beneficial N. Carolina, Inc*, 25 F. App'x 110, 111 (4th Cir. 2001) (applying Title VII

proof scheme to ADEA claim). Therefore, for both sex and age discrimination claims utilizing the pretext framework, Plaintiff must show: (1) he is a member of a protected class; (2) he was performing his duties in a satisfactory manner; (3) he was subjected to an adverse employment action; and (4) he was replaced by someone outside of his protected class. *Warch v. Ohio Ca. Inc Co.*, 435 F.3d 510, 513 (4th Cir. 2006); *Hughes v. Bedsole*, 48 F.3d 1376, 1383 (4th Cir. 1995).

If Plaintiff establishes a prima facie case, the burden shifts to Defendants to produce a legitimate, nondiscriminatory reason for its decision. *Hemphill*, 975 F. Supp. 2d at 557. This is merely a burden of production, not of persuasion. *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 506 (1993). Once Defendant meets its burden by producing a legitimate, nondiscriminatory reason, the sole remaining issue is "discrimination *vel non.*" *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 143 (2000). In other words, the burden shifts back to Plaintiff to demonstrate by a preponderance of the evidence that the legitimate reason produced by Defendants is not the true reason, but was pretext for discrimination. *Reeves*, 530 U.S. at 143. Throughout the burden-shifting scheme set forth in *McDonnell Douglas*, the ultimate burden of proving that Defendants intentionally discriminated against Plaintiff remains at all times with Plaintiff.

a.    Mixed-Motive Analysis of Sex Discrimination

Plaintiff argues that he can present a "'convincing mosaic'" of evidence of discrimination and urges the court to adopt this approach. The Fourth Circuit Court of Appeals recently declined to adopt the "convincing mosaic" formulation, but noted that the Circuit's precedent requires a court to consider evidence of discrimination in the

context of the record as a whole. *Christian v. S.C. Dep't of Labor, Licensing, and Regulation*, No. 14-2168, 2016 WL 3074312, *4 (4th Cir. 2016). Plaintiff argues the following to show that CVS discriminated against him based on sex:

> (1) that he was not the pharmacist involved with the sale of the prescription in January 2013; (2) that a female pharmacist was in fact involved in the prescription transaction on that date; (3) that a second female pharmacist was involved in executing a falsified statement to DHEC in that she did not work at the pharmacy on the date prescribed and would have had no personal knowledge of the same; (4) that another female employee of the Defendant actually committed the act of disclosing the personal information to the police officer; (5) that the Plaintiff was the only individual who was questioned by Hammond and Spivey as being the violator; and (6) that Plaintiff was the only employee that was terminated for any purported violation.

[ECF No. 83 at 21]. Plaintiff's first and second facts are irrelevant, as there has been no allegation by any party, or by Spivey, that anyone from the Pharmacy acted improperly in filling the prescription. Pl. Dep. 167:17–168:5. Plaintiff's third argument concerns Ms. Pelfrey's signed affidavit stating that CVS obtained a positive identification when the prescription was picked up, although she was not working at the time the prescription was picked up. Although the affidavit is not in the record before the court for consideration, even if Ms. Pelfrey's affidavit were false, there is no evidence that: (1) she violated CVS policy or (2) CVS was aware that she signed the affidavit.

Plaintiff also argues that Ms. Garrison actually gave the personal information to the police officer, but fails to acknowledge that it was at his direction. Further, Ms. Garrison received the same discipline as Mr. Blackwell, her male counterpart, for the same conduct. Plaintiff's argument that he was the only employee questioned by Hammond and Spivey is without merit, as he was the PIC and was therefore the highest

ranking Pharmacy employee at the store and the appropriate person under SCDHEC's regulatory authority. Plaintiff has failed to present sufficient direct or circumstantial evidence that sex was a motivating factor in his termination to succeed on a mixed-motive analysis.

          b.        Pretext Framework Analysis for Sex and Age Discrimination

Assuming without deciding that Plaintiff were able to establish a prima facie case of sex and age discrimination, CVS has identified a legitimate nondiscriminatory reason for discharging Plaintiff—he committed a HIPAA violation. Plaintiff suggests that CVS's failure to consult Ms. Smith about the fraudulent prescription shows pretext. However, Ms. Smith was no longer working for CVS at the time of the investigation. Plaintiff also claims that CVS's proffered reason is pretext because it did not terminate Ms. Garrison, the shift manager, who disclosed the personal information to police officers. First, with regard to Plaintiff's sex discrimination claim, and as noted *supra*, CVS disciplined Ms. Garrison and Mr. Blackwell, her male counterpart, for the same for the same conduct. CVS did not consider Ms. Garrison and Mr. Blackwell as culpable as Plaintiff. More importantly, there is no evidence that Ms. Garrison knew she was providing customer information, as she and Plaintiff both testified that he did not explain the reason for his request that she obtain the DL number of B.C. There is no indication that Ms. Garrison was aware that she was providing information related to a customer to her friend. Therefore, Plaintiff has not shown Ms. Garrison is a proper comparator.

CVS suggests a proper comparator is Robyn Brown ("Ms. Brown"), former PIC at CVS store 3542. Ms. Brown was terminated for a first HIPAA violation as a result of

having taken hard copies of prescriptions to her home in an effort to catch up on paperwork. Philips Decl. at ¶ 4; Cunningham Decl. at ¶ 8; Pruter Decl. at ¶ 5; [ECF No. 71-12 at 7–11]. At the time of her termination, Ms. Brown was 33 years old. Cunningham Decl. at ¶ 8. It appears CVS treated younger, female pharmacy employees as severely as Plaintiff for HIPAA violations.

Plaintiff has not argued that Ms. Brown is not a proper comparator, but only that she was not disclosed as a witness. As CVS correctly notes, Ms. Brown need not serve as a witness to be a comparator, as CVS may present evidence of Ms. Brown's termination through another witness with personal knowledge. Because Plaintiff has not shown that CVS's proffered reason for his discharge was pretext for discrimination, the undersigned recommends Defendants be granted summary judgment on his discrimination claims.

### 3. Defamation

To recover for defamation under South Carolina law, the complaining party must show: (1) a false and defamatory statement was made; (2) the unprivileged statement was published to a third party; (3) the publisher was at fault; and (4) either the statement was actionable irrespective of harm or the publication of the statement caused special harm. *Fleming v. Rose*, 567 S.E.2d 857, 860 (S.C. 2002). Plaintiff identifies three claims of defamation: (1) that Mr. Hammond informed Spivey of Plaintiff's termination; (2) that a front-store employee saw Ms. Phillips and Plaintiff walking back to the Pharmacy together after the termination; and (3) that Ms. Nordeoff told a former coworker, Ms. Knight, about Plaintiff's termination. [ECF No. 83 at 30].

First, even if Mr. Hammond had told Spivey that Plaintiff had been terminated, such a statement was true and therefore cannot be the basis for a defamation claim based on the first element. Defamation can be based on an indirect insinuation if the meaning is clear and the assertion is false and malicious. *Eubanks v. Smith*, 354 S.E.2d 898, (S.C. 1987). However, under the circumstances of this case, Mr. Hammond's reporting to Spivey that Plaintiff had been terminated did not insinuate a defamatory meaning. Spivey was already privy to all of the facts related to the investigation, and there is no evidence in the record that Mr. Hammond insinuated additional facts led to Plaintiff's termination.

Second, CVS cannot be liable for defamation based on Mr. Phillips having been seen walking with Plaintiff into the store. Plaintiff alleges Mr. Phillips walked him into the store, there's no allegation that he escorted him from the store. Pl. Dep. 150:1–9. Under these circumstances, Plaintiff has not shown that Mr. Phillips' walking with him into the store insinuated a false and malicious meaning sufficient to constitute defamation. *See Johnson v. Dillard's, Inc.*, No. 3:03-3445-MBS, 2007 WL 2792232, at *18 (D.S.C. Sept. 24, 2007) (dismissing defamation claim and citing cases holding "that where a terminated employee was merely walked off the premises…, the conduct was not defamatory as a matter of law").

With regard to Ms. Nordeoff's statement to Ms. Knight that Plaintiff had been terminated for falsifying a document, Plaintiff has not proved that Defendants may be held liable for Ms. Nordeoff's statements. A principal may be held liable for defamatory statements made by an agent, but only where the agent was "acting within the scope of h[er] employment or within the scope of h[er] apparent authority." *Abofreka v. Alston*

19

Tobacco Co., 341 S.E.2d 622, 625 (S.C. 1986). "An act is within the scope of a servant's employment where reasonably necessary to accomplish the purpose of h[er] employment and in furtherance of the master's business." *Armstrong v. Food Lion, Inc.*, 639 S.E.2d 50, 52 (S.C. 2006). On the other hand, "the act of a servant done to effect some independent purpose of h[er] own and not with reference to the service in which [s]he is employed, or while [s]he is acting as h[er] own master for the time being, is not within the scope of his employment." *Id*. at 276. Therefore, if an employee "steps aside from the master's business for some purpose wholly disconnected with h[er] employment, the relation of master and servant is temporarily suspended; this is so no matter how short the time, and the master is not liable for h[er] acts during such time." *Id*. at 276 (emphasis added) (citations omitted).

Plaintiff has failed to set forth any evidence that Ms. Nordeoff, a pharmacy technician, had any authority to speak on Defendants' behalf related to personnel issues. Because Plaintiff cannot show that Ms. Nordeoff was acting within the scope of her employment in making statements about Plaintiff's termination to Ms. Knight, such statements can not state a defamation claim against Defendants. See *King v. Charleston County School Dist.*, 664 F.Supp.2d 571, 586 (D.S.C. 2009) (holding that school psychologist had no "authority to speak on behalf of the School District . . . involving personnel matters" and thus was not acting within scope of employment); *Fredrich v. Dolgencorp, LLC*, No. 3:13-1072-JFA, 2014 WL 4417407, at *12 (D.S.C., Sept. 8, 2014) (holding company not liable for cashier's statement about coworker, because there was no evidence that cashier's "usual and customary duties . . . also entailed authority to

speak for the company about personnel matters"). Therefore, the undersigned recommends Defendants' motion for summary judgment be granted on Plaintiff's defamation claim.

III.     Conclusion and Recommendation

For the foregoing reasons, the undersigned recommends Defendants' motion for summary judgment be granted in full.

IT IS SO RECOMMENDED.

*Shiva V. Hodges*

July 6, 2016                                         Shiva V. Hodges
Columbia, South Carolina                            United States Magistrate Judge

**The parties are directed to note the important information in the attached
"Notice of Right to File Objections to Report and Recommendation."**

**Notice of Right to File Objections to Report and Recommendation**

The parties are advised that they may file specific written objections to this Report and Recommendation with the District Judge.  Objections must specifically identify the portions of the Report and Recommendation to which objections are made and the basis for such objections.  "[I]n the absence of a timely filed objection, a district court need not conduct a de novo review, but instead must 'only satisfy itself that there is no clear error on the face of the record in order to accept the recommendation.'"  *Diamond v. Colonial Life & Acc. Ins. Co.*, 416 F.3d 310 (4th Cir. 2005) (quoting Fed. R. Civ. P. 72 advisory committee's note).

Specific written objections must be filed within fourteen (14) days of the date of service of this Report and Recommendation.  28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b); *see* Fed. R. Civ. P. 6(a), (d).  Filing by mail pursuant to Federal Rule of Civil Procedure 5 may be accomplished by mailing objections to:

Robin L. Blume, Clerk
United States District Court
901 Richland Street
Columbia, South Carolina 29201

**Failure to timely file specific written objections to this Report and Recommendation will result in waiver of the right to appeal from a judgment of the District Court based upon such Recommendation.**  28 U.S.C. § 636(b)(1); *Thomas v. Arn*, 474 U.S. 140 (1985); *Wright v. Collins*, 766 F.2d 841 (4th Cir. 1985); *United States v. Schronce*, 727 F.2d 91 (4th Cir. 1984).